NO. 12-04-00115-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS


§APPEAL FROM THE 

THE STATE OF TEXAS FOR THE BEST
INTEREST AND PROTECTION OF               §     COUNTY COURT AT LAW OF
A.D.

§CHEROKEE COUNTY, TEXAS





MEMORANDUM OPINION
            Appellant A.D. appeals from an order of commitment for temporary inpatient mental health
services and an order to administer psychoactive medication. After a hearing without a jury, the trial
court ordered A.D. committed to Rusk State Hospital for a period not to exceed ninety days and
entered an order authorizing the Texas Department of Mental Health and Mental Retardation to
administer psychoactive medication to A.D. In two issues, A.D. asserts the evidence is legally and
factually insufficient to support the order of commitment and the trial court erred in granting the
State’s application for administration of psychoactive medication. We affirm.

Background
            On March 25, 2004, an application for court-ordered temporary mental health services was
filed requesting the court commit A.D. to Rusk State Hospital for a period not to exceed ninety days. 
The application was supported by a certificate of medical examination for mental illness, prepared
by a physician, Dr. S. Lahiri, who had examined A.D. on March 24. Dr. Lahiri diagnosed A.D. as
suffering from psychosis NOS. He found that A.D. is mentally ill, likely to cause serious harm to
others, and is suffering severe and abnormal mental, emotional or physical distress, is experiencing
substantial mental or physical deterioration of her ability to function independently, and is unable
to make a rational and informed decision as to whether to submit to treatment. 
            Dr. Lahiri reached these conclusions because, on March 24, A.D. was having delusions of
persecution and grandiosities. She said imposters had stolen her family members’ identities and
were posing as her family members. Also on that date, A.D. threatened to kill her family. Dr. Lahiri
further found that A.D. presents a substantial risk of serious harm to herself or others if not
immediately restrained, an opinion he based on A.D.’s behavior and on evidence of severe emotional
distress and deterioration in A.D.’s mental condition to the extent she cannot remain at liberty. 
Specifically, Dr. Lahiri based this opinion on A.D.’s statements that others are impersonating her
relatives, her belief that her family is against her, and on her behavior. 
            On March 25, 2004, A.D. was examined by Dr. Charles Plyler who then also prepared a
certificate of medical examination for mental illness. Dr. Plyler diagnosed A.D. with psychosis NOS
and indicated that A.D. is mentally ill and likely to cause serious harm to others. He further
determined that she is suffering severe and abnormal mental, emotional, or physical distress, is
experiencing substantial mental or physical deterioration of her ability to function independently,
which is exhibited by her inability to provide for her basic needs, and she is unable to make a rational
and informed decision as to whether or not to submit to treatment. He came to these conclusions
because A.D. said she feels alienated from her family and she perceives her family to be against her. 
She thinks people are impersonating her real family. Further, she had homicidal thoughts toward
her family. Dr. Plyler is also of the opinion that A.D. presents a substantial risk of serious harm to
herself or others if not immediately restrained, which is demonstrated by her behavior and evidence
of severe emotional distress and deterioration in her mental condition to the extent she cannot remain
at liberty. He based this conclusion on the above described statements.
            Dr. Plyler testified at the hearing, first restating his diagnosis that A.D. is suffering from
psychosis NOS. He testified that she has threatened her family and is likely to cause serious harm
to others. He determined that A.D. is suffering severe and abnormal mental, emotional, or physical
distress and is unable to take care of her daily needs. He explained that she was disturbed by a
severe distortion of her reality by paranoid delusion phenomena. She felt that her entire family had
been replaced by imposters who were threatening to her and she was, in turn, threatening the family. 
Dr. Plyler stated that on March 23, A.D. had threatened to kill her mother. He then clarified that she
threatened to kill the people she thought were impersonating her family, although those people
actually were her family members. Her medical records of the emergency commitment included an
affidavit of someone who quoted A.D. as threatening to kill her entire family. He testified that the
affect of the delusions is diminishing, but she is still suffering some. If released from the hospital,
she might continue to be a threat if she does not take her medication. He testified that, at the time
of the trial, she was not compliant with medication. Dr. Plyler stated that she is presently a danger
to other people and she will not continue to improve without medication. The doctor stated that
Rusk State Hospital is the least restrictive available option for A.D. at this time. 
            Cyndi Brevig, a social worker at Rusk State Hospital, testified that she is a member of A.D.’s
treatment team. She has spoken to A.D.’s mother, Elia Perez, on five or six occasions. A.D.’s
mother never said the family members were concerned for their safety. 
            A.D. testified in her own behalf. She explained that her son’s father, who is in the military,
is returning from active duty overseas. She planned to reunite with him. She said that the signature
on the application to have her committed was not her mother’s. She said that Elia Perez told her she
would come in and state that A.D. never threatened to kill the family. A.D. explained that Mrs.
Perez manhandled her and A.D. told her she would press charges the next time Mrs. Perez put her
hands on A.D. But that was the extent of the argument because she went to her room and shut the
door. A.D. explained that she would never threaten to kill “this whole family” because she had
already lost her entire family. Mrs. Perez is not her biological mother. Her mother was shot in the
head a long time ago. She said she loves the Perez family and protects them as much as she can. 
The affidavit allegedly signed by Elia Perez is a forgery and she plans to use it in the lawsuit she will
be pursuing. A.D. insisted that the signature on the affidavit was not Mrs. Perez’s signature. 
            A.D. explained that she had a tumor and was on chemotherapy but that she has never taken
cancer medication because she is more interested in the quality of her life. She said she is a peaceful
person and still recovering from the many physical injuries she has had. She explained that she is
still trying to get through the grieving cycle because she has lost a large number of loved ones. She
said she is taking an anti-psychotic medication. A.D. denied ever threatening anyone. She explained
that she is a black belt in martial arts and was trained not to put her hands or feet on any person
because “you can definitely kill someone.” She said she does not want to kill anyone because she
does not have a need to. She is trying to enjoy her life. She likes to sing and dance when no one is
watching. Most of the time she never speaks to or sees Elia and Oscar Perez. Although she lives
in the same house, it is a 5000-square-foot house and she is there alone during the day. She only sees
them after 8:30 p.m., when they “might have a cup of coffee and talk a little bit.” She said that is
the extent of their relationship. 
            If released, she would go back to the Perez home. Mrs. Perez told A.D. she would pick her
up. However, she wants to make contact with her ten-year-old son, who lives in Washington state,
and his father, to try to reconcile. A.D. said she has never told anyone that she wished harm to
others. She gets angry sometimes and has probably said “I’m going to kick your butt” or “I’m going
to throw a shoe at you.” But she would never actually physically harm anyone, especially not Oscar
or Elia Perez. A.D. said that all of the Perez’s children ran off and she would be there for them no
matter what. 
            A.D. told the court she does not feel she is a threat to anyone. She has been taking
medication she normally does not take. She has been in an outpatient program through the military. 
She had never been given any medication through that program because of the side effects. She has
artificial body parts due to some of the injuries she has had. She wants to improve the quality of her
life and Rusk State Hospital is not conducive to her future plans. A.D. wants to go home and
believes that if the Perezes feel she is a threat, they will call the constable again. She reiterated that
she has no plans or intentions to harm them or anyone in their family and never would. She stated
that she has not seen them in almost eight years and is trying to get to know them again.
            On cross-examination, A.D. explained that she has several different options upon leaving the
hospital. She said she has an apartment in Utah and she has to meet with her spouse. Her son is
taken care of by a nanny who is also a legal guardian. The nanny is to take care of her son while she
and her husband are on missions or deployments or whatever is going on in A.D.’s life. Her son is
in Washington because he is “medically fragile” and has doctors and schools there. A.D. does not
actually know if her son is safe right now because the nanny is not very communicative and has not
returned her phone calls.
            A.D. said she would return to the Perez home because that is where her property is. Then
she would go to Washington. Oscar and Elia Perez indicated to her they have no problems with her. 
They told her the doctor was lying and that they never said she threatened to kill them. She said it
was also a lie that she told a doctor she had threatened to kill her family. She then explained that
there might have been a miscommunication because her mother does not speak English very well
and Oscar does not hear very well. A.D. explained that she can speak ten languages fluently,
although she gets them “all jumbled up” sometimes. She also explained that she has no memories
from below the age of twenty and has been diagnosed with post-traumatic stress disorder and
depression. She clarified that she voluntarily went to anger management classes with her husband. 
            The trial court entered an order for temporary inpatient mental health services after
determining that the evidence supports the allegations that A.D. is mentally ill and that she is likely
to cause serious harm to others. The court ordered A.D. committed to Rusk State Hospital for a
period not to exceed ninety days. A separate hearing was then held on the State’s application for
order to administer psychoactive medication. At the close of evidence, the court entered an order
to administer psychoactive medication for the period of temporary commitment.

Sufficiency of the Evidence
            In her first issue, A.D. asserts the evidence is neither legally nor factually sufficient to support
the order of commitment. She contends that the State did not prove by clear and convincing
evidence that A.D. is mentally ill and as a result of that mental illness is likely to cause harm to
others. She argues that, at the time of the hearing, she was not exhibiting characteristics of psychosis
and therefore her behavior did not meet the definition of mentally ill. Further, she contends that the
evidence does not show an overt act or continuing pattern of behavior tending to confirm that A.D.
is likely to cause serious harm to others. Thus, she argues, the State failed to meet its evidentiary
burden under the statute. 
            In a legal sufficiency review where the burden of proof is clear and convincing evidence, the
reviewing court must consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
finding was true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). The reviewing court must assume
that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do
so. Id. A court should disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible. Id. 
            In addressing a factual sufficiency of the evidence challenge, this court must give due
consideration to evidence that the factfinder could reasonably have found to be clear and convincing. 
In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). We must determine whether the evidence is such that
a factfinder could reasonably form a firm belief or conviction about the truth of the State’s
allegations. Id. “If, in light of the entire record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient.” In re J.F.C.,
96 S.W.3d at 267.
            The trial judge may order a proposed patient to receive court-ordered temporary inpatient
mental health services if the judge or jury finds, from clear and convincing evidence, that the
proposed patient is mentally ill and, as a result of the mental illness he is likely to cause serious harm
to himself, is likely to cause serious harm to others, or is (i) suffering severe and abnormal mental,
emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of his 
ability to function independently, which is exhibited by his inability, except for reasons of indigence,
to provide for his basic needs, including food, clothing, health, or safety, and (iii) unable to make
a rational and informed decision as to whether or not to submit to treatment. Tex. Health &
Safety Code Ann. § 574.034(a) (Vernon 2003). “Mental illness” means an illness, disease, or
condition, other than epilepsy, senility, alcoholism, or mental deficiency, that substantially impairs
a person’s thought, perception of reality, emotional process, or judgment, or grossly impairs behavior
as demonstrated by recent disturbed behavior. Tex. Health & Safety Code Ann. § 571.003(14)
(Vernon Supp. 2004-2005). To be clear and convincing under the statute, the evidence must include
expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of
behavior that tends to confirm either the likelihood of serious harm to the proposed patient or others,
or the proposed patient’s distress and the deterioration of his ability to function. Tex. Health &
Safety Code Ann. § 574.034(d) (Vernon 2003). 
            The State provided expert testimony explaining that A.D. is mentally ill and describing her
behavior and statements. Dr. Lahiri stated in his certificate of medical examination that, on
March 24, A.D. had said that others had stolen her family members’ identities and were
impersonating them. He described her as delusional. She had delusions that her family was
persecuting her and she made threats to kill her family. Dr. Plyler testified that A.D. is disturbed by
severe distortion of her reality by paranoid delusion phenomena. A.D. felt alienated from her family
and perceived them to be against her. A.D. thought people were impersonating her real family and
that they were threatening to her. She had threatened to kill the people she thought were
impersonating her family. Dr. Plyer stated that, at the time of the hearing, he considered A.D. to be
a danger to other people. This testimony shows that A.D.’s thought, perception of reality, and
judgment were substantially impaired. See Tex. Health & Safety Code Ann. § 571.003(14). 
Additionally, this is expert testimony of an overt act, a threat to kill, that tends to confirm the
likelihood of serious harm to others. The trial court could have disbelieved A.D.’s testimony to the
contrary. See In re J.F.C., 96 S.W.3d at 266.
            Considering all the evidence in the light most favorable to the findings, we conclude a
reasonable trier of fact could have formed a firm belief or conviction that these findings were true. 
See In re J.F.C., 96 S.W.3d at 266. This evidence satisfies the statutory requirement for clear and
convincing evidence in support of the order for temporary inpatient mental health services. See Tex.
Health & Safety Code Ann. § 574.034(d). The evidence is legally sufficient to support the trial
court’s order. See In re J.F.C., 96 S.W.3d at 266.
            In addressing A.D.’s factual sufficiency complaint, we consider the evidence the factfinder
could reasonably have found to be clear and convincing. In re C.H., 89 S.W.3d at 25. A.D. testified
that she would never threaten to kill the Perez family. She loves the Perez family and has no need
to kill anyone. She is trying to enjoy life. A.D. testified that Elia and Oscar Perez said she never
threatened to kill them. A.D. also testified that she would return to the Perez home only temporarily
because she plans to reunite with her husband and son. In light of the entire record, the evidence that
the trial court could not have credited in favor of its findings is not so significant that it could not
reasonably form a firm belief or conviction that A.D. is mentally ill and is likely to cause serious
harm to others. See id. Thus, the evidence is factually sufficient to support the trial court’s findings. 
Because we hold the evidence is both legally and factually sufficient to support the trial court’s
order, we overrule A.D.’s first issue.

Psychoactive Medication
            In her second issue, A.D. asserts the trial court erred in entering an order authorizing
administration of psychoactive medication. She argues that such an order must be based on a valid
order for inpatient mental health care and, due to the reasons asserted in her first issue, the trial
court’s order for inpatient mental health care is not valid. 
            The court may enter an order authorizing the administration of psychoactive medication if
it finds by clear and convincing evidence that the patient is under an order for temporary or extended
mental health services, the patient lacks the capacity to make a decision regarding the administration
of the proposed medication, and treatment with the proposed medication is in the best interest of the
patient. Tex. Health & Safety Code Ann. § 574.106(a) (Vernon 2003). 
            Having found the evidence sufficient to support the trial court’s order of commitment, we
have determined that the trial court’s order for temporary mental commitment is valid. Therefore,
we reject A.D.’s argument that the order authorizing administration of psychoactive medication is
invalid on that basis. See id. We overrule A.D.’s second issue.
 
Conclusion
            The evidence is legally and factually sufficient to support the trial court’s order of
commitment for temporary inpatient mental health services. Further, the trial court did not err in
ordering administration of psychoactive medication.
            We affirm the trial court’s orders of commitment for temporary inpatient mental health
services and for administration of psychoactive medication.

                                                                                                     JAMES T. WORTHEN 
                                                                                                                 Chief Justice


Opinion delivered September 22, 2004.
Panel consisted of Worthen, C.J., Griffith, J. and DeVasto, J.




(PUBLISH)